RUDE, Appellant, vs. ALGIERS and another, Respondents.*

*June 4—June 26, 1958.*

* Motion for rehearing denied, without costs, on October 7, 1958.

616

For the appellant there were briefs by *Schubring, Ryan, Petersen & Sutherland,* and oral argument by *Floyd A. Brynelson* and by *James C. Herrick,* all of Madison.

For the respondents there was a brief by *Hale, Skemp, Hanson & Schnurrer* of La Crosse, and oral argument by *Thomas H. Skemp.*

WINGERT, J.   A new trial will be directed on the issues of Algiers' causal negligence and plaintiff's damages.

1. *Res judicata.* Plaintiff Rude contended at the trial and in this court that defendants were bound by the determination of the federal court in the prior action that McCourt was not negligent; and that therefore it was error to submit questions relative to McCourt's negligence to the jury in Rude's present case. Perhaps Rude reasoned that, although the cases were consolidated for trial and she could not avoid the submission of issues properly existing between McCourt and Algiers, she could object to the submission of a question which suggested that the cause of her injuries might be

McCourt's negligence and not that of Algiers. We need not pass upon that question now, for there must be a new trial for other reasons, and in view of the disposition made of McCourt's case decided herewith, it will not be necessary on the new trial to submit questions relative to McCourt's negligence or to apportionment of negligence between her and Algiers, since Rude need only prove some degree of causal negligence on the part of Algiers in order to recover.

Rude did not contend at the trial that Algiers' negligence was *res judicata* in her favor by virtue of the determination of the federal court that he was negligent, nor that the federal court jury's appraisal of her entire damages at $10,000 was *res judicata*. Indeed, Rude expressly disclaimed any such contention relative to the negligence issues, if we correctly understand her counsel's statements to the trial court. We do not understand Rude's argument in this court on the subject of *res judicata* to go beyond the proposition that the defendants were estopped to relitigate the questions of negligence on the part of McCourt and the apportionment of negligence as between McCourt and Algiers.

Accordingly we do not find it necessary to decide whether the determinations of the federal court and jury with respect to the negligence of Algiers and Rude's damages are *res judicata* in the present action. It may be observed in passing, however, that in the federal court both Rude and Algiers were asserting negligence on the part of McCourt, and Rude did not claim any negligence on Algiers' part, presumably because of the limitations of the jurisdiction of the federal courts where diversity of citizenship is absent. Therefore Rude and Algiers were not adverse to one another with respect to the issues of negligence, as distinguished from that of Rude's damages. It is a general principle of the law of *res judicata*, though probably subject to exceptions, that

"The rendition of a judgment in an action does not conclude parties to the action who are not adversaries under the pleadings as to their rights *inter se* upon matters which they did not litigate, or have an opportunity to litigate, between themselves." Restatement, Judgments, p. 384, sec. 82.

2. *Admission of map in evidence.* At the trial one Hall, a civil engineer, was permitted to testify with respect to a map of the highway at the scene of the accident which he had prepared and on which certain hypothetical elements were shown, and the map was then admitted in evidence over objection. This is said to have been prejudicial error. To weigh that contention it is necessary to summarize some of the evidence as to how the collision occurred.

The testimony was that the cars were approaching each other on a slippery road, each in its own proper traffic lane, McCourt at 40 miles per hour and Algiers at 25 miles per hour. There was a conflict as to which car invaded the wrong lane. McCourt testified that she kept going straight ahead on her own side of the road and that when Algiers' car was about one and one-half or two car lengths from hers, its "lights suddenly came at me," and the car crossed the center line into her path.

The map, to which exception is taken, showed a scale representation of McCourt's car in the middle of the north lane of the highway, and a similar representation of Algiers' car in the middle of the south lane, one and one-half car lengths west of the former car. This was assumed to represent the position of the cars according to McCourt's testimony, at the time she testified that she first saw Algiers coming toward her. The map also shows the positions the Algiers car would have been in, at about the center of the road, if Algiers, going 25 miles per hour, had immediately turned to the left with varying degrees of sharpness; and the positions in which McCourt's car would have taken at the instant Algiers crossed the center line had it continued to go

straight west without collision, at the assumed speed of 40 miles per hour.

The purpose of the exhibit was apparently to show that McCourt's version of the collision could not have been true, because if McCourt, admittedly going 40 miles per hour, had continued straight ahead in the middle of her lane, and if Algiers, going 25 miles per hour, had not started to turn until he was within one and one-half car lengths of Mc-Court's car, there either would have been no collision, because by the time the front of the Algiers car reached the north lane of the highway, McCourt's car would have passed that point, or the cars would have collided at a different angle from that which the damage indicated.

Objection was made to the testimony and the exhibit on the ground that both were hypothetical, and assumed wrong facts and failed to consider other material facts. Thus it is complained that the exhibit showed both cars in wrong positions; that it assumed normal traction notwithstanding testimony that the road was slippery, and hence that Algiers could not have turned as sharply as represented; and that the hypothetical movements of the cars were contrary to fact because in fact a collision occurred. Assuming that these criticisms are sound, we cannot see that they were prejudicial to the plaintiffs, for had the cars been placed near the edges of the pavement in strict accordance with the testimony and had allowance been made for slipperiness, it would have taken Algiers still longer to reach McCourt's path, and a collision would have been still less likely.

A more-serious criticism of the exhibit is that it assumed that the cars were separated by only one and one-half car lengths when Algiers started to turn, whereas McCourt's testimony was that when the cars were one and one-half or two car lengths apart "the lights suddenly came at me." It is said that Algiers must have started to turn at a point farther away, in order that his car would be sufficiently

turned so that his lights would shine at McCourt when the cars were one and one-half car lengths apart.

Where a map or diagram is used for the purpose of illustration and argument as to what might have happened, or as here, what could not have happened, and not as accurate representations of what did happen, we do not think that the same strict adherence to facts supported by testimony is necessary as in the case of hypothetical questions asked of expert witnesses. In making marks on a diagram to illustrate possibilities, some latitude is no doubt permissible so long as it is kept clear that there is no attempt to represent what actually happened. The trial court has wide discretion with respect to such matters. Where there appears to be any likelihood that the jury may be confused or misled by reception of such an exhibit in evidence, the trial court would do well to give an appropriate cautionary instruction.

In the present case the trial court might well have excluded the map and some of the testimony; but a majority of this court doubt that it was an abuse of discretion or prejudicial error to receive them, since full opportunity to cross-examine the witness was given, and all of the discrepancies between the assumptions on which the map was based and the facts established by other testimony could have been and no doubt were argued to the jury. We do not definitely decide the question of prejudicial error, for there must be a new trial anyway, because of the inadequate verdict with respect to damages. The opinion of some members of the court that the receipt of the map in evidence was prejudicial error, and the doubts of others, are among the factors leading us to direct that the new trial extend to the issues of Algiers' causal negligence as well as to damages.

3. *Damages inadequate.* The jury's appraisal of Rude's damages "by reason of her injury," exclusive of medical and hospital expense and damage to clothing, at $683, was clearly and seriously inadequate.

The accident occurred on November 24th at about 9 p. m. Miss Rude was still unconscious at the hospital about 10:30 and the doctor considered her to be in "very deep shock," and in "rather critical condition." She had a severe head laceration from which she was bleeding profusely, a fracture of the left clavicle, dislocation of the left clavicle and the sternum, seven broken ribs, and a fracture of both bones of the right forearm. Treatment of the broken ribs caused so much pain that the clavicle could not be treated for several days. "It was very painful" testified the doctor. She was given oxygen much of the time. Some indication of the seriousness of her injuries is given by the fact that her medical and hospital expenses were stipulated at $1,698. Miss Rude was in the hospital two weeks, and did not return to work until February 1st. She was a schoolteacher with a salary of $4,100 per year. Her loss of earnings alone amounted to at least $700 or as much as $825, depending on how computed, yet the jury awarded her only $683 for both loss of earnings and pain and suffering. We may take judicial notice that the jury in the federal court fixed her damages at $10,000, though she could not collect them because the issues of liability went against her in that court.

A combination of circumstances causes us serious doubt that justice has been done. The jury's finding on damage is seriously unrealistic and strongly suggests perversity, although perversity was not found by the trial court; the challenged map may have impressed the jury as having greater weight and significance than it was entitled to; two juries have reached contradictory findings, those of the federal jury with respect to negligence having been approved on appeal. Although it is entirely possible that juries may properly weigh evidence differently and come to different, but unimpeachable, verdicts, the inadequacy of damages found, together with the possibility that unwarranted weight was attributed to the map, reasonably suggest that the verdict in

circuit court may have been a miscarriage of justice. We have therefore concluded to exercise our discretionary power to grant a new trial. Sec. 251.09, Stats.

*By the Court.*—Judgment reversed, with directions to grant a new trial on the issues of the causal negligence of Algiers and plaintiff's damages other than medical and hospital expense and damage to her clothing. Appellant may tax one half of the entire cost of printing the briefs and appendix filed jointly by the appellants in this case and in *McCourt v. Algiers,* ante, p. 607.